**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DAVID LOCKE,                                                  :

                    Plaintiff,          :

          - against-                               :

TOM JAMES COMPANY and OXXFORD             :
CLOTHES XX INC., f/k/a "OXXFORD           :
INTERNATIONAL CLOTHES, INC." and d/b/a    :
"OXXFORD DIRECT",                         :
                               :

                    Defendants.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: MAR 2 5 2013

MEMORANDUM DECISION
AND ORDER
11 Civ. 2961 (GBD)

**GEORGE B. DANIELS, United States District Judge:**

Plaintiff David Locke brings this action against his former employers, Defendants Tom James Company ("Tom James") and Oxxford Clothes XX, Inc. ("Oxxford"), for breach of contract, violations of the New York State Labor Law ("NYS Labor Law"), and a violation of the Employer Retirement Income Security Act ("ERISA"). Locke entered into an employment agreement and various compensation plans with Defendants, under which Defendants agreed to award him stock options and shares, commission, and contributions to his 401(k) and profit sharing account. Plaintiff alleges that Defendants withheld such compensation when Plaintiff terminated his employment and started his own custom clothing company in direct competition with Defendants. Plaintiff seeks to recover the value of his earned stock options and shares, immediate disbursement of the employer contributions to his 401(k) and profit-sharing account, and the costs, disbursements, interest, and attorneys' fees arising out of this litigation. He also seeks declaratory relief to hold the parties' employment agreement unenforceable.

1

Defendants filed two counterclaims, alleging that Locke: (i) breached the restrictive covenants in his employment agreement; and (ii) misappropriated Defendants' trade secrets. They seek total damages in excess of $200,000, including interest and attorneys' fees, on both counterclaims. They also seek an injunction against Locke to enjoin him from breaching the covenants contained in the employment agreement and misappropriating their trade secrets.

Defendants now move for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, dismissing all of Locke's claims. Locke cross-moves for summary judgment declaring: (i) Defendants' breach of the employment agreement; (ii) violations of the NYS Labor Law; (iii) an ERISA violation; (iv) the unenforceability of his employment agreement with Oxxford; and (v) dismissing both of Defendants' counterclaims.

Defendants' motion for summary judgment dismissing Locke's claims is GRANTED. Locke's cross-motion for summary judgment dismissing Defendants' counterclaims is DENIED.

## BACKGROUND

From September 1991 to May 2005, Locke worked as a clothier and salesman for Defendant Tom James, one of the world's largest manufacturers and retailers of high-end custom clothing. Am. Compl. ¶¶ 9, 12, 17. Upon joining the company, he was trained to approach potential customers, cold-call for business, and measure and fit clientele for custom-made clothing. Deposition Transcript of David Locke, dated November 11, 2011 ("Locke Tr."), pp. 48:21-50:24, 56:6-23, Ex. 8 to Pl.'s Cross-Mot. for Summ. J.; Decl. of David Locke, dated August 6, 2012 ("Locke Decl.") in Supp. of Pl.'s Cross-Mot for Summ. J., ¶ 13. As an employee, he engaged in direct door-to-door sales and conducted visits to customers' homes and offices for consultations, to showcase fabric swatches, and to take measurements for tailoring. Locke Tr. at 54:19-57:10; Locke Decl. at ¶ 7.

After initially being based out of Tom James's Knoxville, Tennessee office between 1991 and 1994, Locke was transferred to the New York office in October 1994, where he performed similar duties and job functions as he did in Tennessee. Locke Tr. at 48:18-20, 59:12-20, 70:4-71:21. While in New York, he received a copy of the Martindale-Hubbell directory of law firms from Tom James's then manager of the New York office. Id. at 62:18-63:8. On behalf of Tom James, Locke used this directory to contact lawyers in the New York City area and solicit their business. Id.

In May 2005, Locke was promoted and transferred to the employ of Oxxford, a wholly-owned subsidiary of Tom James. Id. at 82:8-16; Deposition Transcript of James Phillip Williams, dated July 10, 2012 ("Williams Tr."), p. 12:8-12, Ex. 9 to Pl.'s Cross-Mot. for Summ. J.. Around this time, Oxxford had expanded its operations to create an entity called Oxxford Direct for the purpose of selling clothing at a higher price point than the Tom James line. Id. at 19:3-15; Locke Decl. at ¶ 18. Locke was assigned to assist in launching and maintaining Oxxford Direct's operations as a result of his success in selling higher-end clothing for Tom James. Williams Tr. at 19:16-20; Locke Decl. at ¶ 20.

On July 25, 2005, Locke received a new proposed employment agreement with Oxxford, containing several provisions prohibiting Locke from competing with Defendants or soliciting their customers during the course of his employment, and for two years upon terminating his employment, in New York City, within a 50-mile radius of New York City, and in any territory where he previously conducted business for Defendants. Williams Tr. at 29:2-25, 43:20-44:8; Locke Decl. at ¶ 24; see Ex. 13 to Pl.'s Cross-Mot. for Summ. J.. The agreement required Locke to agree that he would not: "possess, access, use or disclose the Company's customer list, or any part thereof, with the intent or result of effecting or engaging in any competition against the

Company"; "solicit, sell, or service any customers of the company (including in person, by agent, mail and telecommunications, or via the Internet) in furtherance of any business development, marketing and/or sales involving made-to-measure and custom-tailored clothing"; or "engage (either in person, by agent, mail and telecommunications or via the internet) in any business development, management, marketing and/or sales capacity in furtherance of his … own competing business enterprise or for other persons and entities competing against the Company in connection with the made-to-measure and custom-tailored clothing". Id. at 4. Furthermore, the employment agreement provided that if Locke violated the agreement, the two-year prohibition period would begin to run on the date Locke ceased his competition. Id.

In accordance with Oxxford's instructions, Locke consulted with an attorney, noted his objections to the restrictive covenants in a letter to Defendants' Human Resources Department, and indicated that he was advised not to sign the agreement absent changes to those provisions. Locke Decl. at ¶¶ 25-27; see Ex. 12 to Pl.'s Cross-Mot. for Summ. J.. Approximately one month later, Locke received another proposed employment agreement that contained all of the provisions that he had objected to, along with further provisions restricting his employment and post-employment periods with Defendants. Locke Decl. at ¶ 29. Shortly after receiving the second proposed agreement, Locke received a phone call from Phillip Williams, Tom James's Chief Financial Officer, who stated that Locke would not receive payment if he refused to sign the agreement. Id. at ¶ 31-32; Williams Tr. at 41:17-43:5. Locke signed the agreement in September 2005 and remained employed until March 12, 2010. Locke Decl. at ¶ 36.

Throughout the course of his employment, Locke entered into several stock option agreements with Defendants pursuant to the terms of his compensation plans. Ex. 18 to Pl.'s Cross-Mot. for Summ. J.; Ex. 15 to Def.'s Cross-Mot. for Summ. J.. These agreements were

effectuated in 2003, 2004, and 2008. According to the terms of the pay plan agreements, Locke was to receive $5,000 worth of stock options for every 1,000 units of clothing he sold, and an additional $1,000 worth of stock options for every fifty units he sold beyond 1,000 units. See Ex. 15; see also Locke Decl. at ¶ 11. The agreements further stated that the options would vest ten years after the date of the agreements or when the optionee turned sixty-five, whichever event occurred first. Ex. 18, p. 1.

Also pursuant to his compensation plans, Locke entered into a series of stock subscription agreements in 1995, 1997, 1999, 2001 and 2004. The stock subscription agreements allow Defendants' employees to invest in Tom James by directly purchasing shares of the company's common stock. Ex. 19 to Pl.'s Cross-Mot. for Summ. J.. Under the express terms of these agreements, a subscriber who leaves the company within ten years of the agreement date would be "required to sell his Shares to the Company, and the Company is required to purchase said Shares." Id. at 3. The subscription agreements also state that Defendants "shall have the right to purchase" shares of a subscriber who leaves the company ten or more years after the agreement was signed. Id. at 4. Furthermore, in the event that the subscriber ceases to be employed by Defendants prior to full payment of his shares subject to the subscription agreements, the subscriber would not be able to acquire any shares not yet purchased and paid for. Id. at 3. The total value of the stock options and shares Plaintiff accumulated is approximately $21,000. Locke Decl. ¶¶ 42-54.

Additionally, and further pursuant to his compensation plan, Locke entered into a 401(k) and profit sharing agreement with Defendants. The express provisions of the plan state that the plan administrator must withhold the distribution of benefits to plan participants who terminate their employment with Defendants and violate trade secrets and/or non-competition agreements

5

until the participants reach the age of sixty-five. The plan also states that, notwithstanding this

provision:

> the Administrator shall distribute the balance of a former employee's Participant's Elective Account under the Plan that is attributable to the former employee's Elective Contributions ... as soon as administratively feasible following ... the first anniversary of any ... former employee's termination of employment with the Company, even if the former employee is in violation of any existing trade secret and/or noncompete agreement; provided the former employee is not re-employed by the Employer as of the distribution date.

Def.'s Rule 56.1 Statement at 2; Ex. E to Def.'s Mot. for Summ. J..; see also Exs. G-I to Def.'s

Mot. for Summ. J..[1]

In 2010, Locke terminated his employment with Oxxford Direct and established his own

competing business, David Locke Clothing, Inc., through which he sold clothing in the New

York City area largely in the same manner that he did as an employee with Defendants. Locke

Tr. at 167:8-19; Locke Decl. at ¶ 3. Sixteen of seventeen of Locke's clients (16 of 17) at David

Locke Clothing are Defendants' former customers. Locke Tr. at 110:20-117:10; 167:23-168:14.

Locke originally commenced this action on April 1, 2011 in the Supreme Court of the

State of New York. Defendants thereafter removed the action to this Court. Def.'s Rule 56.1

Statement, ¶ 12.

## LEGAL STANDARD

Summary judgment is appropriate where the evidence, viewed in the light most favorable

to the non-moving party, shows "that there is no genuine issue as to any material fact and that the

---

[1] Defendants' 401(k) and profit-sharing agreement was revised after Defendants received a letter from the United States Department of Labor, indicating that certain provisions of the agreement involving the release of employee contributions was in violation of the federal ERISA statute. See Exs. 6-7 to Pl.'s Cross-Mot. for Summ. J.. The essential terms pertaining to the other provisions of the agreement remain the same. Payment of employee contributions to the 401(k) and profit-sharing account has been resolved by the parties and is thus no longer at issue in this case.

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Vacold, L.L.C. v. Cerami, 545 F.3d 114, 121 (2d Cir. 2008). The burden rests upon the moving party to show that there is no genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A fact is "material" only where it will affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For there to be a "genuine" issue of fact, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." Id. In determining whether there is a genuine issue of material fact, the Court is required to resolve all ambiguities and draw all inferences in favor of the non-moving party. Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004). Where there is no evidence in the record "from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact," summary judgment is appropriate. Caitlin v. Sobol, 93 F.3d 1112, 1116 (2d Cir. 1996). Where both parties move for summary judgment, the court must independently assess each motion. If either movant fails to demonstrate that the material facts are undisputed and dictate judgment for that party, then that party's motion must be denied. See, e.g., Krauss v. Oxford Health Plans, Inc., 517 F.3d 614, 621-22 (2d Cir. 2008); White River Amusement Pub, Inc. v. Town of Hartford, 481 F.3d 163, 167 (2d Cir. 2007).

## STOCK OPTION AND SUBSCRIPTION AGREEMENTS

Locke alleges that Defendants breached several stock option agreements and stock subscription agreements by failing to re-purchase or redeem approximately $21,000 worth of Tom James stock options and shares[2] after he voluntarily terminated his employment.[3] He

---

[2] The parties do not address the respective values of the shares and the stock options in Locke's possession.
[3] The value of Locke's stock was $25,240.61 on July 12, 2010 and was $25,243.59 on August 24, 2010. Pl.'s Mem. Of Law in Supp. Of Cross-Mot. For Summ. J. at 11. $5,079.23 of this amount was forwarded to Locke on, or about,

argues that he is entitled to the value of the options pursuant to the specific terms of the aforementioned agreements because he met yearly sales goals throughout the course of his employment. Defendants contend that Locke forfeited his options upon his voluntary termination of employment with Tom James and his subsequent competition against the company. Locke also argues that he is entitled to redeem the value of the shares he purchased under the stock subscription agreements because the language of those agreements mandates Defendants to repurchase Locke's shares. Defendants contend that they have no obligation to repurchase or pay out the value of the stock shares Locke obtained through the stock subscription agreements because Locke terminated his employments prior to ten years from the date of the agreements.

A careful review of the factual record indicates that Defendants did not breach the terms of either the stock option agreements or the stock subscription agreements by declining to redeem Locke's stock options and shares. The terms of the stock option agreements and stock subscription agreements explicitly make Locke's right to exercise the options and redeem the shares contingent upon Locke's continued employment with Defendants.

*2003, 2004, and 2008 Stock Option Agreements*

Locke fails to demonstrate that Defendants breached the stock option agreements dated October 1, 2003, November 20, 2004, and September 1, 2008. Each of the three stock option agreements proffered into evidence explicitly requires Locke to be continuously employed by Defendants for a ten-year period commencing on the date the options were granted prior to

---

February, 25, 2011. This $5,079.23 represents Locke's investment, plus interest. See Williams Tr. at 66:17-24. Over $21,000 of the stock value has not been redeemed.

exercising the options.[4]  The agreements also state that any unexercised options would expire concurrently with the employee's resignation from the company.  Thus, none of the options earned through any of those agreements had vested by the time Locke terminated his employment with Defendants in March 2010.  To the extent that he owned options pursuant to any of these agreements, those options expired upon his resignation.

*1995, 1997, and 1999 Stock Subscription Agreements*

Locke also fails to proffer sufficient evidence to demonstrate that Defendants breached the stock subscription agreements signed by both parties in 1995, 1997, and 1999.  Each of these agreements explicitly states that Tom James will have the right to re-purchase any stock shares purchased by the subscriber if the subscriber leaves Tom James for any reason after ten years from the date of the respective agreements.  The agreements, however, contain no language obligating Tom James to re-purchase those shares.  In contrast, the same agreements state that Tom James would be required to re-purchase the shares if the subscriber terminated his employment within ten years of signing the subscription agreements.  It is undisputed that Locke terminated his employment with Tom James in March of 2010, more than ten years after each of agreement dates.  Therefore, Locke's claim that Defendants breached these agreements is dismissed.

**Failure to Redeem Value of Earned Stock Options in Violation of NYS Labor Law**

Locke also alleges that Defendants violated the NYS Labor Law by withholding the options he earned throughout the course of his employment.  Specifically, he argues that he is entitled to redemption of his stock options because the remaining stock value of those options constitutes wages under NYS Labor Law Article 6 §190, *et. seq.*  Defendants contend that

---

[4] The agreements also state that the options may be exercised on the employee's sixty-fifth birthday, if that date precedes both the ten-year waiting period and the employee's termination of employment with Tom James.

Locke's earned stock options should be considered equity-based incentive compensation, which falls outside the purview of the challenged provisions of the NYS Labor Law.

The NYS Labor Law defines wages as "the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis." NYS Labor Law Art. 6 § 190(1). "[C]ertain forms of 'incentive compensation' that are more in the nature of a profit-sharing arrangement and are both contingent and dependent, at least in part, on the financial success of the business enterprise" do not qualify as wages. Truelove v. Northeast Capital & Advisory, Inc., 95 N.Y.2d 220, 223-24 (N.Y., 2000) (holding that payments from a bonus compensation plan that neither predicated payments upon the employee's own productivity, nor provided the employee with contractual rights to bonus payments based on his productivity, did not qualify as wages); see International Paper Co. v. Suwyn, 978 F.Supp. 506, 514; see also Tischmann v. ITT/Sheraton Corp., 882 F.Supp. 1358, 1370; see also Magness v. Human Resource Servs., 161 A.D.2d 418, 419. In Truelove, the New York Court of Appeals considered the fact that the compensation at issue was to be paid from a bonus pool "dependent solely upon" the employer's "overall financial success", and that the bonus was "was entirely discretionary and subject to the non-reviewable determination of his employer". The court concluded that payments under such a plan did not constitute wages. Id.

Here, Locke was awarded a specific number of stock options directly based on his own sales performance. Thus, while Defendants' correctly assert that the monetary value of each Tom James share would depend on the overall performance of the company and thus remain outside Locke's control, the intrinsic value of the stock options, the right to purchase Tom James stock, would not change. Defendants could have chosen to exclude Locke from participating in

these option agreements in any given year, but to the extent that Locke earned the options through his own performance and pursuant to the compensation plan for that year, Locke is entitled to those stock options as wages. [5]

It is undisputed that Locke received the stock options earned pursuant to the employment and option agreements. Locke's argument is that Defendants are required to compensate him for the value of his unexercised options. The payment at issue, however, is not the monetary value of what Locke could have received had he exercised those options, but the options themselves. Accordingly, Locke's claim that Defendants violated the NYS Labor Law by declining to redeem his now-expired options is dismissed. [6]

## 401(k) AND PROFIT SHARING AGREEMENT

Locke also alleges that Defendants violated the federal ERISA statute by failing to release the employer contributions in his 401(k) and profit sharing account. Pl.'s Mem. Of Law in Supp. Of Cross-Mot. For Summ. J. at 17. [7] He contends that he is entitled to an immediate disbursement of these funds despite competing with Defendants because more than one year had elapsed following his voluntary termination of employment.

Despite making a cogent case for the return of his own contributions to his account, Locke fails to cite any language or proffer any evidence to establish that Defendants violated

---

[5] In his Amended Complaint, Locke also alleges that Defendant breached stock subscription agreements dated 2001 and 2004. He proffers no evidence, however, of any shares he may own under either of these plans. Furthermore, in Locke's supplemental letters to the Court following oral argument, he specifically clarifies that he is only attempting to recover under the 1995, 1997, and 1999 plans. For these reasons, Locke's claims for recovery under the 2001 and 2004 stock subscription agreements are dismissed.

[6] Locke also claims that delays in commission payments on an annual rather than a monthly basis violated the NYS Labor Law. However, he proffers no evidence, at any stage of discovery, of any calculation of damages stemming from Defendants' alleged failure to timely pay Locke's commissions. Locke conceded at oral argument that damages had not been calculated for any such delay.

[7] In his Amended Complaint, Locke sought to recover both the employee and employer contributions in his 401(k) and profit sharing accounts. At oral argument, the parties agreed that Locke would receive his employee contributions to the retirement account, calculated from the date that Locke submitted his roll-over application. Oral Argument Tr. at 4-5. Accordingly, only the employer contributions remain at issue.

11

either the terms of Tom James's 401(k) and Profit Sharing plan or their ERISA obligations by withholding their own contributions to Locke's account. According to the express provisions of the plan, the plan administrator may withhold the distribution of benefits to plan participants who terminate their employment with Tom James and subsequently violate trade secrets and/or non-competition agreements until the participants reach the age of sixty-five, so long as the administrator releases payment for the employee's own contributions to the account beginning on the first anniversary of the employee's termination.

In light of this language, Locke's rationale for seeking the employer contributions is merely that Defendants failed to produce any documentation from the United States Department of Labor that approved the language of the plan. Pl.'s Mem. Of Law in Supp. Of Cross-Mot. For Summ. J. at 22. This argument is legally insufficient to hold Defendants' liable for breaching its fiduciary duty under ERISA.

## NON-COMPETE AGREEMENT

Locke additionally moves for summary judgment to render his employment agreement with Oxxford null, void, and unenforceable due to the overly restrictive nature of the covenants found therein. He also alleges that the agreement should be held unenforceable because he signed it under duress.

New York courts carefully scrutinize restrictive covenants in light of the "powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood...." Purchasing Assocs., Inc. v. Weitz, 13 N.Y.2d 267, 196 N.E.2d 245, 247, 246 N.Y.S.2d 600 (N.Y. 1963); see Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp., 42 N.Y.2d 496, 369 N.E.2d 4, 6, 398 N.Y.S.2d 1004 (N.Y. 1977). Such covenants must thus satisfy an "overriding requirement of reasonableness" to be enforceable. Reed, Roberts, Assocs., Inc. v.

Strauman, 40 N.Y.2d 303, 353 N.E.2d 590, 592, 386 N.Y.S.2d 677 (N.Y. 1976).  The New York Court of Appeals has held that a restraint is reasonable only if: (1) it is not greater than necessary to protect an employer's legitimate interests; (2) it is temporally and geographically reasonable; (3) it does not impose an undue hardship; and (4) it is not harmful to the public.  BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 388-89 (N.Y. 1999).  A careful review of the employment agreement indicates that the restrictive covenants found therein are not overbroad or greater than necessary to protect Defendants' legitimate interests.

***Employer's Interest***

Employer interests that may justify specific enforcement of a restrictive covenant are limited to: (1) protection of trade secrets; (2) protection of confidential customer information; (3) protection of an employer's client base; and (4) protection against irreparable harm where an employee's services are unique or extraordinary.  Silipos, Inc. v. Bickel, 2006 U.S. Dist. LEXIS 54946 at **8-9 (2006) (citing BDO Seidman, 93 N.Y.2d at 382).  In this case, Defendants allege that Locke misappropriated their confidential and trade secret information, including their "current and future business plans, marketing and pricing strategies, investment and compensation plans, and the compendium or compilation of particularized client information developed, used and maintained by Oxxford Clothes International, Inc. and its employees."

A trade secret is defined as "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it."  Ashland Mgmt. Inc. v. Janien, 82 N.Y.2d 395, 624 N.E.2d 1007, 1013, 604 N.Y.S.2d 912 (N.Y. 1993) (quoting Restatement (Second) of Torts § 757, cmt. B (1979)).  Despite this seemingly far-reaching definition, trade secret protection does not attach to "all confidential business documents."  Marietta Corp. v. Fairhurst, 301 A.D.2d

13

734, 754 N.Y.S.2d 62, 67 (N.Y. App. Div. 2003), modified on other grounds, 9 A.D.3d 816, 781

N.Y.S.2d 387 (N.Y. App. Div. 2004). Defendants proffer no evidence to demonstrate that Locke

misappropriated Defendants' business, investment, compensation, marketing, and pricing plans.

Moreover, New York courts have held that market and pricing strategies do not constitute trade

secrets. Marietta Corp., 754 N.Y.S.2d at 67. Thus, only the compendium of client information

Locke compiled during his time as an employee for Defendants could potentially trigger the

trade-secrets legitimate interest.

Locke cites several cases to demonstrate that courts have held restrictive covenants to be

unenforceable where a client list was created using publically available sources.[8] He argues that

the restrictive covenants in his employment agreement should likewise be held unenforceable

because he used the publically available Martindale-Hubbell directory of legal professionals to

compile the names of attorneys to solicit for business. However, an employee "may not solicit

the latter's customers who are not openly engaged in business in advertised locations or whose

availability as patrons cannot readily be ascertained but 'whose trade and patronage have been

secured by years of business effort and advertising, and the expenditure of time and money,

constituting a part of the good-will of a business which enterprise and foresight have built up.'"

Town & Country House & Home Service, Inc., 3 N.Y.2d 554, 558 (N.Y. 1958) (citing Wiktop &

Holmes Co. V. Boyce, 61 Misc. 126, 131).

In Town & Country House & Home Service, Inc., the New York Court of Appeals held

that an employer was entitled to enjoin its former employee from soliciting its customers because

---

[8] During oral argument, and in a letter submitted to the Court to supplement his cross-motion for summary judgment, Locke cites to Silfen v. Cream, 29 N.Y.2d 387 (N.Y. 1972); Columbia Ribbon & Carbon Manufacturing Co., Inc. v. A-1-A Corp, et al., 42 N.Y.2d 496, 398 N.Y.S.2d 1104, 369 N.E.2d 4 (1977); Reeds, Roberts Associates, Inc. v. Strauman, 40 N.Y.2d 303, 386 N.Y.S. 2d 677, 353 N.E.2d 590 (1976); BDO Seidman, 93 N.Y.2d 382; and Kelly v. Evolution Markets, Inc., 626 F. Supp.2d 364 (S.D.N.Y. 2009).

14

those customers "could not be obtained merely by looking up their names in the telephone or city directory or by going to any advertised locations, but had to be screened from among many other people who did not wish to receive the employer's services. The present case is comparable. Here, the names of attorneys who were willing to pay up to several thousand dollars for suits were not readily available from the Martindale-Hubbell directory. Locke, as Defendants' employee, conducted a careful screening process involving numerous phone calls and/or visits to solicit business and add these individuals to Defendants' roster clientele. Defendants have a legitimate interest in protecting the compendium of customers which it secured with a considerable expenditure of their own time and resources.

Irrespective of whether or not Defendants' compendium of clients constitutes a trade secret, Defendants' client base is clearly a protectable interest. New York courts have held that an employer has a legitimate interest in "preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment." BDO Seidman, 93 N.Y.2d at 392. Protecting customer relationships is especially important where "the employee … work[s] closely with the client or customer over a long period of time, especially when his services are a significant part of the total transaction." Silipos, 2006 U.S. Dist. LEXIS 54946 at *17 (citing BDO Seidman, 712 N.E.2d at 1224 (citation omitted)).

In this case, it is undisputed that Locke serviced Defendants' former customers in violation of the express terms of the restrictive covenants of the employment agreement he signed with Oxxford. Locke concedes that all but one (16 of 17) of his clients at David Locke Clothing were former clients with Defendants. Locke developed and maintained close working relationships with many of these clients throughout the course of his 19-year career with the two

15

companies. He was engaged in every aspect of customer relations, from soliciting business through phone calls, to bringing customers samples of fabric swatches, to taking their measurements. Moreover, most of his business was conducted in customers' offices or homes. Defendants thus have a legitimate interest in reasonably protecting itself against the loss of its client base to a former employee who maintained such extensive, and often exclusive, contact with them. See Portware, LLC v. Barot, 11 Misc. 3d 1059[A], 815 N.Y.S.2d 495, 2001 NY Slip Op 50282[U], at *5 (N.Y. Sup. Ct. 2006) (holding that the plaintiff employer's legitimate interest in enforcing the non-solicitation covenant "is to protect against [the employee's] competitive use of customer relationships that [the employer] enabled him to acquire through his position as account manager" with the employer.)

### *Reasonableness in Time and Area*

Courts will conduct a fact-specific inquiry to determine whether the duration and geographical scope of a restrictive covenant are reasonable. BDO Seidman, 712 N.E.2d at 1224. Locke fails to cite to any authority to substantiate his argument that the terms of the restrictive covenants in his employment agreement with Oxxford were overbroad in terms of their temporal or geographical scope. To the contrary, New York courts have consistently held that a two-year prohibition period can be considered reasonable. See John Hancock Mut. Life Ins. Co. v. Austin, 916 F. Sup. 158 (N.D.N.Y. 1996); HBD, Inc. v. Ryan, 642 N.Y.S.2d 913 (N.Y. App. Div. 1996). Similarly, New York courts have upheld geographical restrictions corresponding with an employer's direct area of business. See, e.g., Coolidge Co. v. Mokrynski, 459 F. Supp. 472 (S.D.N.Y. 1979); see also Karpinski v. Ingrasci, 28 N.Y.2d 45 (N.Y. 1971). The two-year time period and the geographical areas of New York City, any locations within 50 miles of New York City, and any areas where Locke conducted business for Defendants, are reasonable in temporal

16

and geographic scope to protect Defendants' valid interest in protecting its client base.[9] *See*

*Monroe Coverall Service, Inc. v. Bosner*, 283 A.D. 451 (N.Y. App. Div. 1954); *Bates Chevrolet*

*Corp. v. Haven Chevrolet, Inc.*, 13 A.D.2d 27 (N.Y. App. Div. 1961); cf. Columbia Ribbon &

Carbon Manufacturing Co., Inc., 42 N.Y.2d 496 (where a non-compete covenant was found to be

unreasonable because the covenant was not tied to any trade secrets or confidentiality or

competitive unfairness).

### Duress

Locke also argues that the entire employment agreement should be held void, null, and

unenforceable because he signed it under duress. Economic duress can void a contract where the

complainant was compelled to agree to the contractual terms "by means of a wrongful threat

which precluded the exercise of its free will." Rockmore v. Antell, 07 CIV. 3592 (DAB), 2008

WL 4443951 (S.D.N.Y. Sept. 25, 2008) aff'd, 353 F. App'x 517 (2d Cir. 2009) (citing 767 Third

Ave. LLC v. Prix Capital Markets, LLC, 812 N.Y.S.2d 8, 11 (1st Dep't 2006) (citing Stewart M.

Muller Constr. Co. v. New York Tel. Co., 40 N.Y.2d 955, 956 (N.Y.1976)). A party accused of

economic duress will not be found liable for refusing to do that which they are not legally

required to do. Id. (citing Friends Lumber v.. Cornell Dev. Corp., 888, 663 N.Y.S.2d 327

(1997); Bechard v. Monty's Bay Recreation, Inc., 826 N.Y.S.2d 826, 827 (3d Dep't 2006)). A

party asserting duress must do so promptly. Id. (citing VKK Corp. v. National Football League,

244 F.3d 114, 123 (2d Cir.2001)).

Locke signed the non-compete agreement in 2005 after having had the opportunity to

consult his attorney regarding the terms of the contract. Irrespective of what Oxxford's CFO

---

[9] With respect to the third and fourth prongs of the BDO Seidman reasonableness test, Plaintiff does not assert that the enforcement of the non-compete provisions of the employment contract would either impose an undue burden on Locke or be harmful to the public. Upon independent evaluation, the Court does not find that either of these prongs have been met.

may have stated at the time around which the agreement was eventually signed, Oxxford was not legally required to preserve Locke's at-will employment with the company. Furthermore, Locke maintained his employment for a significant period of time following his signing of the agreement. More than five years elapsed before he alleged duress in this action. In light of these factors, Locke's claim that the employment agreement should be held void, null, and unenforceable because he signed it under duress is rejected.

## CONCLUSION

Defendants' motion for summary judgment dismissing Plaintiff's claims is GRANTED. Locke's cross-motion for summary judgment in his favor on his claims and dismissing Defendants' claims is DENIED.


Dated: March 25, 2013
       New York, New York


MAR 2 5 2013

SO ORDERED:

_George B. Daniels_

GEORGE B. DANIELS
United States District Judge

18